UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JHONNATAN HENAO TAMAYO,                                            Petitioner
FATHER

v.                                                         Civil Action No. 3:25-cv-742-RGJ

BLANCA LILIA RAMIREZ TRILLOS,                                      Respondent
MOTHER

* * * * *

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the Petition of Jhonnatan Henao Tamayo ("Petitioner")

for the return of minor child, "V," to Colombia under the Hague Convention on the Civil Aspects

of International Child Abduction and its implementing statute, the International Child Abduction

Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq.* V's mother, Blanca Lilia Ramirez Trillos

("Respondent") answered the petition. [DE 11]. The Court held an evidentiary hearing and heard

sworn testimony from Petitioner and Respondent. [DE 20; DE 21]. Following the hearing,

Petitioner filed proposed findings of fact and conclusions of law. [DE 23]. Respondent filed a

response brief, [DE 24], and Petitioner replied [DE 25]. The matter is ripe. For the reasons below,

the Petition is **DENIED**.

## I. FINDINGS OF FACT

A. Timeline and V's Residence

Petitioner is a 43-year-old dual citizen of the United States and Colombia who resides in

the United States. [DE 21, Hr'g Tr., at 144]. Though Petitioner maintains a residence and

businesses in Colombia, he has primarily resided in New Jersey since 1997. [*Id.*]. In 2023,

Petitioner spent approximately 290 days in the United States and 75 in Colombia, and in 2024 and

1

2025, he spent approximately 245 days in the United States and 120 in Colombia. [*Id.* at 173]. Petitioner currently lives in New Jersey with his wife, and he is employed in New Jersey. [*Id.* at 144, 169]. Respondent was born on May 8, 1988 in Monteria, Colombia and currently resides in Elizabethtown, Kentucky. [*Id.* at 181]. She is a permanent resident of the United States. [*Id.*].

Respondent visited the United States from Colombia on a tourist visa in January 2018. [*Id.* at 187]. She met Petitioner in February 2018 while she was working as a bartender at a New Jersey restaurant owned by Petitioner's mother. [*Id.* at 145, 187]. Petitioner and Respondent occasionally had sexual relations with one another during Respondent's time in the United States. [*Id.* at 187]. During that same period of time, Respondent had sexual relations with six other people. [*Id.* at 187–88]. In or around April 2018, Respondent learned that she was pregnant. [*Id.* at 188]. Around that same time, she informed Petitioner of her pregnancy and they attended pregnancy-related medical appointments together. [*Id.* at 178, 188].

Respondent left the United States in July 2018 before the expiration of her tourist visa. [*Id.* at 187–88]. She gave birth to V on December 11, 2018 in Armenia, Colombia. [*Id.* at 189]. V's birth certificate initially listed Respondent as V's mother but listed no father. [*Id.* at 165, 189]. In February 2019, Petitioner visited Respondent and V in Colombia for an afternoon. [*Id.* at 189]. Petitioner also visited V in September 2022, during which time Respondent was out of the country—in Elizabethtown, Kentucky—and V was living with Respondent's aunt in Colombia. [*Id.* at 190]. The final time Petitioner saw V was in September 2023, when Petitioner appeared at V's school without Respondent's consent. [*Id.* at 191]. Respondent testified that Petitioner attempted to take V from school, that "he grabbed her," and that "she started screaming, running, and locked herself in the bathroom." [*Id.*]. Petitioner testified that he "flew many times" to see V, but after spending a day with her, Respondent would "hide the kid away and not allow [him] to

2

see her." [*Id.* at 148–49]. Petitioner also asked Respondent to voluntarily acknowledge his paternity of V, which she refused. [*Id.* at 149].

V lived in Colombia until May 2024. [*Id.* at 162]. During that time, V primarily lived with Respondent's aunt while Respondent traveled back and forth between Colombia and the United States. [*Id.* at 148, 190]. On December 22, 2022, during one of her trips to the United States, Respondent married her husband—a United States citizen living in Elizabethtown, Kentucky. [*Id.* at 190]. Respondent took V out of Colombia and entered Ecuador on May 31, 2024. [*Id.* at 184]. On June 2, 2024, Respondent and V departed Ecuador and entered Peru. [*Id.* at 184–85]. On June 6, 2024, Respondent and V entered the United States. [*Id.* at 183].

Since arriving in the United States, V has resided in Elizabethtown, Kentucky with Respondent and Respondent's husband. V is a permanent resident of the United States and has not left the country since her arrival. [*Id.* at 182]. She is enrolled in school in Elizabethtown, Kentucky and participates in extracurriculars, such as karate and gymnastics. [*Id.* at 192–93]. V sees a pediatrician and a mental health therapist, and she gets regular evaluations by an allergist and a pulmonologist. [*Id.* at 193].

B.  Court Proceedings

In May 2023, Petitioner filed a paternity action in Colombia seeking to establish himself as a legal parent to V. [*Id.* at 149; Pl.'s Ex. 3].[1] Shortly thereafter, the Colombian court issued an order prohibiting V from leaving the country for a period of two months ("orange alert"). [Pl.'s Ex. 3]. The specifics of this order, which Petitioner refers to as an "orange alert" are unclear. Petitioner testified that the orange alert is "an order by the court stating that the child cannot leave

_____

[1] The facts regarding this order come, in part, from the translated Colombian court order provided by Petitioner, the validity of which Respondent disputes. For reasons explained in this Court's conclusions of law, the Court will consider the translated document.

3

Colombia" and that the alert "was conditioned [on] the defendant taking the DNA test." [DE 21 at 150]. Petitioner testified that because Respondent never showed up to the DNA tests, the orange alert "stays active as of today." [*Id.*]. Yet Petitioner has not provided a copy of this order and instead asks the Court to rely only on his own testimony as evidence of the orange alert. The certified translation of the final order of the Colombian Family Court briefly discusses the purported orange alert, although without referring to it as such. Specifically, the opinion states that in May 2023, "a precautionary measure was decreed consisting of a prohibition on the minor [V] leaving the country for a period of two months" and "[b]y order dated August 28, 2023, the request for lifting the prohibition on the minor [V] leaving the country was transferred, and the plaintiff was also required to proceed with the DNA test at his own expense." [Pl.'s Ex. 3]. This language does not indicate to the Court that the orange alert remained in place in May 2024, when V was removed from Colombia. With no copy of the "orange alert" order and only Petitioner's limited testimony to go on, the Court cannot conclude that such an order was in place at the time of V's departure from Colombia. Moreover, despite Petitioner's testimony that this orange alert was in place when Respondent departed the country with V, Respondent had no trouble getting through security or through customs was able to leave the country with no issues. [DE 21 at 196].

The Colombian court also ordered Respondent to appear with V to submit to a DNA test on September 15, 2023. [Pl.'s Ex. 3]. Respondent failed to appear, so the DNA test was rescheduled for June 7, 2024. [*Id.*]. By that point, Respondent and V were already in the United States, and Respondent again failed to appear. [DE 121 at 183; Pl.'s Ex. 3]. Respondent was aware that there was an active family court case involving V in Colombia, and she was aware of the June 7 DNA test date. [DE 21 at 201, 219]. She justified her non-appearance on grounds that Petitioner had attempted to take V from school, resulting in a criminal complaint against Petitioner. [*Id.*].

4

The court accepted this excuse and rescheduled the DNA test for October 9, 2024. [*Id.*]. Respondent failed to appear and explained to the Colombian court that she was in the United States resolving her and V's immigration status. [*Id.*].

In an order dated December 16, 2024, the Colombian court found that Respondent's refusal to undergo DNA testing established a presumption of Petitioner's paternity. [*Id.*]. The court declared that V was the daughter of Petitioner and assigned the exercise of parental authority to both Petitioner and Respondent. [*Id.*]. The court also ordered that custody and personal care of V remain in the hands of Respondent. [*Id.*; DE 21 at 157].

In October 2024, Petitioner realized that V was no longer in Colombia. [DE 21 at 167]. In March 2025, he filed a Hague application for the return of V to Colombia. [*Id.*]. Before Petitioner filed the action before this Court, the Central Authority within the United States Department of State transmitted a voluntary return letter to Respondent requesting that she return to Colombia with V. [*Id.* at 162]. Respondent declined to return voluntarily. [*Id.*]. Petitioner proceeded to file this action in November 2025. [*Id.* at 167]. Petitioner also filed for custody of V in Hardin Circuit Court in July 2025. [*Id.* at 168; Def.'s Ex. 1]. In the Hardin County petition for custody ("Hardin County petition"), Petitioner states that he "has been a resident of the State of New Jersey for 25 years." [DE 8-1]. Petitioner confirmed on the record, "I've lived in New Jersey all my life." [DE 21 at 170]. The Hardin County judge ordered the parties to submit to a DNA test, which, at the time of the evidentiary hearing in this case, had not been completed. [DE 21 at 168].

## II.    STANDARD

The Hague Convention on the Civil Aspects of International Child Abduction was adopted by signatory nations to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001) (quoting Hague

5

Convention, preamble).[2]  The "core premise" of the Convention is that "'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020) (quoting Convention, pmbl.). "To that end, the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Id*. (citing Convention, art. 12). "Upon the child's return, the custody adjudication will proceed in that forum." *Id*.

In the United States, Congress has implemented the Hague Convention through the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.* (formerly 42 U.S.C. § 11601, *et seq*.). The ICARA provides federal district courts with jurisdiction to determine "rights under the [Hague] Convention [but] not the merits of any underlying child custody claims." *Id.* §§ 9001(b)(4), 9003(a). In other words, the Hague Convention allows a federal district court to consider the merits of the abduction claim (i.e., whether removal or retention was wrongful) but prohibits consideration of the underlying custody dispute. *Friedrich v. Friedrich*, 983 F.2d 1396, 1399 (6th Cir. 1993) ("*Friedrich I*"); *see also* Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

The Hague Convention's language encompasses both the wrongful removal and the wrongful retention of a child. *Argueta v. Argueta-Ugalde*, No. CV 22-12840, 2023 WL 1466820, at *4 (E.D. Mich. Feb. 2, 2023), *aff'd sub nom. Rodrigues Dos Santos Argueta v. Argueta-Ugalde*, No. 23-1107, 2023 WL 4635901 (6th Cir. July 20, 2023). "Generally speaking, 'wrongful removal'

---

[2] The Convention on the Civil Aspects of International Child Abduction is available on the website of the Hague Conference on Private International Law (www.hcch.net), under "Conventions" or under the "Child Abduction Section." https://assets.hcch.net/docs/e86d9f72-dc8d-46f3-b3bf-e102911c8532.pdf (last accessed June 4, 2026).

refers to the taking of a child from the person who was actually exercising custody of the child. 'Wrongful retention' refers to the act of keeping the child without the consent of the person who was actually exercising custody." Hague Int'l Child Abduction Convention, Text and Legal Analysis ("Public Notice"), 51 Fed. Reg. 10494-01, 1986 WL 133056, at 10503 (Mar. 26, 1986); *see also March v. Levine*, 136 F. Supp. 2d 831, 835 (M.D. Tenn. 2000), *aff'd*, 249 F.3d 462 (6th Cir. 2001).

Pursuant to the Hague Convention, the removal or retention of a child is considered wrongful where:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention[,] those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3. To establish a *prima facie* case for the return of a child, the petitioner must demonstrate by a preponderance of the evidence that: (1) the child had a "habitual residence" in a foreign country that is a signatory to the Convention; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the country of habitual residence; and (3) the petitioner was exercising those rights at the time of the child's wrongful removal or retention. *Pliego v. Hayes*, 86 F. Supp. 3d 678, 693–94 (W.D. Ky. 2015) citing 22 U.S.C. § 9003; *McKie v. Jude*, 2011 WL 53058, at *5 (E.D. Ky. Jan. 7, 2011) (citations omitted).

If the court determines that the petitioner has proven a *prima facie* case that the child was wrongfully removed or retained within the meaning of the Hague Convention, the ICARA mandates that the child "be promptly returned unless one of the narrow exceptions set forth in the [Hague] Convention applies." 22 U.S.C. § 9001(a)(4). To that end, if the petitioner establishes a

*prima facie* case of wrongful removal or retention, the burden shifts to the respondent to show that an exception applies either by clear and convincing evidence or by a preponderance of the evidence, depending on the exception at issue. *See* Hague Convention, art. 13; *Friedrich I*, 983 F.2d at 1400 (citing 42 U.S.C. §§ 11603(e)(2)(A)–(2)(B)); *Abbott v. Abbott*, 560 U.S. 1, 22 (2010) ("Return is not required if the abducting parent can establish that a [Hague] Convention exception applies.").

First, the child should not be returned if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007) (quoting 42 U.S.C. § 11603(e)(2)(A)). Second, the child should not be returned if he or she "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, art. 13. Third, the child may not be returned if the removal proceeding was commenced more than one year after the removal and the child has become settled in the new environment. Hague Convention, art. 12. Fourth, the child should not be returned if doing so "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) ("*Friedrich II*"); Hague Convention, art. 20. Finally, a court may refuse to order the child's return if the parent seeking return consented or acquiesced to the removal or retention of the child. *Friedrich II*, 78 F.3d at 1067. The respondent must prove this defense by a preponderance of the evidence. *Id*.

The existence of an exception notwithstanding, "a federal court retains, and should use when appropriate, the discretion to return a child . . . if return would further the aims of the Convention." *Friedrich II*, 78 F.3d at 1067 (citation omitted); *see also* Hague Convention, art. 18

8

("The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time."); *cf. Golan v. Saada*, 596 U.S. 666, 676 (2022) ("By providing that a court 'is not bound' to order return upon making a grave-risk finding, Article 13(b) lifts the Convention's return requirement, leaving a court with the discretion to grant or deny return."). This discretion is equitable in nature but "limited to exceptional cases." *Swett v. Bowe*, 733 F. Supp. 3d 225, 293 (S.D.N.Y. 2024), *aff'd sub nom. Urquieta v. Bowe*, 120 F.4th 335 (2d Cir. 2024) (citing cases); *see also Lozano v. Montoya Alvarez*, 572 U.S. 1, 18–19 (2014) ("[C]ourts have equitable discretion under the Hague Convention to order a child's return even after the child has become settled." (Alito, J., concurring)).

The Court considers Petitioner's *prima facie* case and the Respondent's defenses to return below.

### III.    CONCLUSIONS OF LAW

A.  Authentication of Colombian Court Order

Respondent first argues that the Court may not consider the Colombian court order presented by Petitioner because the order has not been authenticated under Fed. R. Evid. 902 or Fed. R. Civ. P. 44(a)(2). [DE 24 at 257]. Respondent maintains that the order must apostilled by Colombia's Ministerio de Relaciones Exteriores to be considered self-authenticating under Fed. R. Evid. 902(3). [*Id.* at 257]. Nor, according to Respondent, has the order been authenticated under Fed. R. Civ. P. 44(a)(2) because Petitioner has provided neither "a final certification by a diplomatic or consular officer of the United States stationed in the country where the record is kept, or an apostille complying with the Hague Apostille Convention." [*Id.*]. The Court first addresses this objection.

Article 14 of the Hague Convention allows a court to "take notice directly of . . . judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the

9

child, without recourse to the specific procedures for . . . the recognition of foreign decisions which would otherwise be applicable." Hague Convention, Art. 14. ICARA provides that, with respect to any petition under the Hague Convention or any documents or information included with the petition, "no authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court." 22 U.S.C. § 9005.

Thus, the text of both the Hague Convention itself and its implementing statute allow a court to take judicial notice of foreign judicial decisions without requiring authentication. *See Nunez Bardales v. Lamothe*, 423 F. Supp. 3d 459, 465 (M.D. Tenn. 2019); *March v. Levine*, 249 F.3d 462, 475 (6th Cir. 2001) ("Like the treaty itself, the implementing legislation also provides a generous authentication rule."). Fed. R. Evid. 902 and Fed. R. Civ. P. 33—both of which provide mechanisms for authenticating documents—are irrelevant here, where authentication is expressly made optional by the governing statute. Petitioner has provided a certified translation of the Colombian court order, [Pl.'s Ex. 3], and has testified that the order is what he claims it to be. [DE 21 at 156–57]. This is sufficient for purposes of admissibility under the Hague Convention. Accordingly, the Court will consider the certified translation of the Colombian court order in its analysis.

B. *Prima Facie* Case

1. *Habitual Residence*

First, Petitioner must prove that V had a habitual residence in a foreign country that is a signatory to the Hague Convention. Neither the Hague Convention nor ICARA defines the term "habitual residence," but the Sixth Circuit has stated that a child's habitual residence is "the nation where, at the time of [a wrongful removal or retention], the child has been present long enough to

10

allow acclimatization, and where this presence has a degree of settled purpose from the child's perspective.'" *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009) (internal quotation marks omitted) (quoting *Robert v. Tesson*, 507 F.3d 981, 992 (6th Cir. 2007)). This inquiry "must focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich I*, 983 F.2d at 1401. To guide the court's analysis of habitual residence, the Sixth Circuit has enumerated five principles:

> First, habitual residence should not be determined through the technical rules governing legal residence or common law domicile. Instead, courts should look closely at the facts and circumstances of each case. Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence. Third, this inquiry should focus exclusively on the child's past experience. Any future plans that the parents may have are irrelevant to our inquiry. Fourth, a person can have only one habitual residence. Finally, a child's habitual residence is not determined by the nationality of the child's primary care-giver. Only a change in geography and the passage of time may combine to establish a new habitual residence.

*Panteleris v. Panteleris*, 601 F. App'x 345, 349 (6th Cir. 2015) (quoting *Robert*, 507 F.3d at 989).

V is a Colombian citizen and lived in Colombia from her birth in 2018 to her departure from Colombia in May 2024. During that time, V primarily lived with Respondent's aunt, while both Respondent and Petitioner traveled back and forth between the United States and Colombia. Despite the parties' residence in the United States, it is clear that V resided in Colombia until her removal in 2024. Respondent's testimony makes clear that V attended school in Colombia, received medical care in Colombia, and that until May 2024, "her entire life was in Colombia[.]" [DE 21 at 201]. Though Respondent often traveled to the United States, there is no evidence that V ever traveled to the United States until May 2024. Focusing exclusively on V's experience and not that of her parents, the Court concludes that Colombia constituted her habitual residence at the time of alleged wrongful removal. Respondent appears to concede this point. [DE 24 at 260

11

("Rights of custody are determined by reference to the law of the state of habitual residence — here, Colombia.").

### 2. *Breach of Custody Rights Under Colombian Law*

In addition to proving that Colombia was V's habitual residence at the time of her wrongful removal or retention, Petitioner must also prove that her removal was in breach of the "rights of custody attributed to a person, an institution or any other body" under Colombian law. Hague Convention, art. 3. This case differs from most Hague Convention cases because at the time of V's removal from her country of habitual residence, the Petitioner lacked legal status as a parent. As a result, the Court must contend with whether any "custody rights" can exist under Colombian law when a Petitioner has not even been declared a parent.

Petitioner maintains that at the moment of V's removal from Colombia, three independent sources provided "rights of custody" that were breached by V's removal. First, Petitioner's pending paternity action vested the Colombian family court with rights of custody as an "institution or any other body" under Article 3. [DE 23 at 241]. Second, the orange alert issued by the Colombian court constituted a *ne exeat* order, which created a right of custody. [*Id.* at 242]. Third, the December 16, 2024 final order of the Colombian court declared that Petitioner shared parental authority with Respondent, and that order operates retroactively to the date of V's removal. [*Id.* at 244]. In response, Respondent argues first that the Colombian order does not vest Petitioner with "rights of custody," but simply gives him "parental authority." DE 24 at 261]. Second, because the Colombian order postdates V's departure from Colombia, her removal was not "wrongful" at the time. Finally, the Colombian order is not final because Respondent's appeal is pending. [*Id.* at 263].

12

### a. Pending paternity action

It is undisputed that at the time of V's removal from Colombia, there was an ongoing paternity action in Colombian Family Court. Petitioner maintains that this paternity action gave the Colombian Family Court the right to determine and restrict V's place of residence pending resolution of paternity, thus vesting custody rights in the Colombian Family Court and making any removal a violation of those rights. [DE 23 at 241].

Under the Convention, custody rights are "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5(a). Custody rights "may arise . . . by operation of law or by reason of a judicial or administrative decision." Hague Convention, art. 3. Under the Hague Convention, custody rights are defined by the law of the child's country of habitual residence—here, Colombia. *See Abbott*, 560 U.S. at 10; *Flores-Aldape v. Kamash*, 202 F. Supp. 3d 793, 803 (N.D. Ohio 2016). In other words, the Court must consult Colombian law to determine the content of Petitioner's right, but follow "the Convention's text and structure to decide whether the right at issue is a 'righ[t] of custody.'" *Abbott*, 560 U.S. at 10. While many cases focus on the parent's right to determine the child's place of residence, the Hague Convention makes clear that this right can be held by an "institution," such as a court. Hague Convention, art. 3. Pursuant to that language, Petitioner argues that the Colombian Family Court had the right to determine the child's place of residence by virtue of the ongoing paternity action. Accordingly, the Court must determine whether, under Colombian law, the Colombian Family Court possesses custody rights over a child by virtue of its jurisdiction over an ongoing action seeking to establish legal parentage over that child.

Although outside this circuit, the case of *Mohacsi v. Rippa* is helpful to this Court's analysis. 346 F. Supp. 3d 295, 316 (E.D.N.Y. 2018), *aff'd sub nom. In re Matter of NIR*, 797 F.

13

App'x 23 (2d Cir. 2019). In that case, respondent—the mother—was unmarried and gave birth to her child in Hungary after having a sexual relationship with petitioner. *Id.* at 307. Petitioner was not listed as the child's father on the birth certificate, and two months after the child's birth, he filed a paternity action in Hungary to establish his parental rights. *Id.* Respondent subsequently failed to appear for DNA testing ordered by the court. *Id.* Almost one year after the child's birth, and while the paternity action was ongoing, respondent left Hungary with the child and entered the United States. *Id.* at 309. Approximately ten months later, the Hungarian court issued a decision declaring petitioner the father of the child, and the child's birth certificate was changed to reflect petitioner's paternity. *Id.* Upon learning that respondent and the child were no longer in Hungary, petitioner filed a petition for the return of the child under the Hague Convention.

In determining whether there was a wrongful removal, the court considered whether either the petitioner or the Hungarian court had custody rights at the time of removal by virtue of the pending action. *Id.* at 315. In doing so, the court considered testimony from Hungarian law experts, who testified that the pendency of the Hungarian court paternity proceeding did not affect the Respondent's status as the sole custodial parent under Hungarian law. *Id.* at 310, 315. The experts also testified that Hungarian law does not give paternity orders retroactive effect. *Id.* at 310. The court therefore concluded that "the expert testimony . . . flatly rejected the argument that the Hungarian court . . . had any custodial rights with respect to [the child] while the case was pending." *Id.* at 316. Moreover, because the paternity order postdated the removal and was not retroactive under Hungarian law, it did not make the removal wrongful.

Unlike in *Mohacsi*, there is no expert testimony here on the substance of Colombian family law. Rather, Petitioner simply argues that the Colombian Family Court "held continuing jurisdiction" over V because the court "ordered DNA testing on three occasions, . . . and entered

14

the Orange Alert prohibiting the child's removal . . . ." [DE 23 at 241]. As noted above, however, Petitioner has provided the Court with no evidence of an ongoing "orange alert" issued by the Colombian Family Court other than his own testimony. Without more, the Court cannot use this alleged order as the basis for finding that the Colombian Family Court had the right to decide V's country of residence at the time of her departure. Petitioner also fails to point to any Colombian law that confers custody rights in the Colombian Family Court while a paternity action is ongoing. As the Supreme Court explained in *Abbott v. Abbott*, the Court must look to Colombian law to determine the content of the petitioner's right—that is, whether Colombian law granted the Colombian Family Court the right to decide V's country of residence. *See* 560 U.S. at 10. Only after determining the content of the right under Colombian law does the Court then ask whether that right is a "right of custody" under the Hague Convention. *Id.*; *see also Takeshi Ogawa v. Kyong Kang*, 946 F.3d 1176, 1180 (10th Cir. 2020). The Court cannot conclude simply from an ongoing paternity action that the action created a custody right under Colombian law.

In *Takeshi Ogawa v. Kyong Kang*, the Tenth Circuit rejected the petitioner's argument that his divorce agreement with respondent gave him a "right of custody" when petitioner failed to apply the law of the country of habitual residence—Japan—to the agreement. 946 F.3d at 1180. Though the divorce agreement stated that petitioner "shall obtain custody of" the children, the petitioner did not tell the court "what 'content' the word 'custody' in the Divorce Agreement ha[d] under Japanese law or how that might fit within the Convention's definition." *Id.* The petitioner provided no local law that supported his argument that the word "custody" under Japanese law lined up with the Convention's understanding of "custody." *Id.* at 1180–81. In other words, he offered no Japanese legal support for interpreting the divorce agreement to grant him the right to determine the children's place or residence or "rights relating to the care of the person of the child."

15

*Id.* at 1181. Without this, the petitioner failed to meet his burden of showing by a preponderance of the evidence that he had rights of custody as defined in the Convention. *Id.* at 1182.

Here, too, Petitioner has not provided the Court with Colombian law that supports his argument that a pending paternity action in the Colombian Family Court gives that court a continuing right to determine the child's place of residence or to rights relating to the care of the child. And in its own review of the Colombian Civil Code, the Court could find no provision that would suggest that the Colombian Family Court had custodial rights with respect to V simply because the case was pending. Regardless, the burden is on Petitioner to show by a preponderance of the evidence that V's removal was in breach of custody rights under the laws of Colombia. In failing to offer any Colombian law in support of his position, Petitioner fails to meet this burden.

### b. Orange Alert

Petitioner next argues that the orange alert issued by the Colombian Family Court created a right of custody because it was a *ne exeat* order; i.e., an order preventing a parent from removing the child from a country. [DE 23 at 242]. He maintains that the Colombian Family Court issued on order preventing V from leaving Colombia until completion of the DNA test, that this order was active when Respondent left the country with V on May 31, 2024, and that "[the] order alone confers rights of custody on Petitioner and on the issuing court[.]" [*Id.* at 243]. Petitioner cites to *Abbott v. Abbott*, where the Supreme Court held that a father held a *ne exeat* right under Chilean law, and that right was a "right of custody" under the Hague Convention. [DE 23 at 242]; *Abbott*; 560 U.S. at 15.

Petitioner's argument suffers from the same flaw as his first. Petitioner has not provided sufficient evidence of the orange alert to convince the Court of its existence, or that it remained in effect at the time of V's departure from Colombia. The only evidence that Petitioner cites to in his

16

brief is his own testimony. [DE 23 at 242–43]. He claims that the orange alert "is a paradigmatic *ne exeat* order," but he does not even supply the order. [*Id.* at 242]. Petitioner did attach to his original Petition a purported letter sent from "Migración Colombia" to Petitioner, dated June 4, 2025, stating that "[a]s of the date, the country exit bans remain in effect." [DE 1-5]. Yet, this document was translated into English by Petitioner himself, no certified translation was provided, no original copy was provided to the Court, and no testimony as to the authenticity of this document was provided at the evidentiary hearing. The Petition to which this document was attached does not mention the attachment, [*see* DE 1], and Petitioner does not mention this document in his post-hearing brief. In short, the Court does not feel confident in the legitimacy of this letter or the translation and thus cannot conclude from it that there was a binding order in place preventing V from leaving Colombia on May 31, 2024. Without this letter, the Court is left with only Petitioner's testimony that an orange alert was in place and the final Colombian Family Court order stating that "[b]y order dated August 28, 2023, the request for lifting the prohibition on the minor [V] leaving the country was transferred[.]" [Pl's Ex. 3]. The latter does not tell the Court whether the order remained in place on May 31, 2024. Petitioner therefore relies only on his self-serving testimony as to the orange alert. This testimony alone, however, does not demonstrate by a preponderance of the evidence that V's removal on May 31, 2024 was in breach of a right of a custody right. As a result, Petitioner's second argument also fails.

### c. Retroactive Final Judgment

Petitioner's final argument that V's removal breached his right of custody is that the December 16, 2024 order of the Colombian Family Court operates retroactively, giving him "parental authority at the time of the May 31, 2024 removal." [DE 23 at 243–44]. He maintains that the order simply confirms rights "that already existed." [DE 25 at 282]. Respondent argues

that this order cannot serve as the source of Petitioner's custody right because (1) it only establishes Petitioner as a legal parent, it does not confer rights of custody; and (2) it postdates the date of removal. [DE 24 at 262].

The Court first addresses whether an order that postdates a child's removal can retroactively make that removal wrongful. A similar argument was raised in *White v. White*, 718 F.3d 300 (4th Cir. 2013). In that case, the respondent had full custody of the child when she removed the child from Switzerland in April 2011. *Id.* at 302. A March 2013 order by a Switzerland court, however, adjusted its earlier custody arrangements to grant petitioner "the custody of and parental authority over the child." *Id.* at 303. The petitioner argued that this order made the respondent's prior removal of the child wrongful. *Id.* at 306. The court rejected this argument, noting that the March 2013 order "does not purport to reject the authenticity of, or retroactively alter, the previously governing October 2010 order granting [respondent] sole custody of the child." *Id.* at 308. Because the relevant inquiry depends on "rights of custody *at the time of removal*," the post-hoc order had no bearing on petitioner's custody rights as of the date of removal. *Id.* at 306–07.

At the time of V's removal, Petitioner had not been declared her legal parent.[3] Thus, Petitioner would have to show that, under Colombian law, the December 16, 2024 order retroactively granted Petitioner custody rights as of May 31, 2024. *See Mohacsi*, 346 F. Supp. 3d at 315 (explaining that Hungarian order declaring petitioner to be a parent that post-dated the child's removal was not retroactive under Hungarian law, so petitioner did not have custody rights under Hungarian law when the child was removed). Petitioner maintains that "[a] paternity

---

[3] The Court also notes that Petitioner was ultimately declared a legal parent of V only because Respondent's "reluctance to undergo the DNA test . . . [gave] rise to the presumption of paternity[.] [Pl.'s Ex. 3, at 11]. No DNA test has ever confirmed Petitioner's paternity.

18

judgment under Colombian law operates retroactively," but he cites no Colombian law to that effect. [DE 23 at 244]. The order itself states that it "assign[s] the exercise of parental authority over the minor [V] to both [Petitioner] and [Respondent]" and that it "leave[s] custody and personal care of the minor [V] in the hands of [Respondent]." [Pl.'s Ex. 3, at 12]. There is nothing in the order that purports to make the ruling retroactive. Without this, and with no Colombian law offered by Petitioner to support his position, the December 16, 2024 order appears to be only a decree of Petitioner's parental status as of that date. Much like *White*, the Court cannot say that this order retroactively altered Respondent's sole custody of V on May 31, 2024.

> As the Seventh Circuit appropriately noted in *Redmond v. Redmond*,
>
> [t]he Hague Convention targets international child *abduction*; it is not a jurisdiction-allocation or full-faith-and-credit treaty. It does not provide a remedy for the recognition and enforcement of foreign custody orders or procedures for vindicating a wronged parent's custody rights more generally. Those rules are provided in the Uniform Child–Custody Jurisdiction and Enforcement Act.

724 F.3d 729, 741 (7th Cir. 2013) (emphasis added). In short, a Hague Convention petition is not the proper avenue to assert one's custody rights when those rights did not exist at the time of the child's removal. Under the Convention, "[w]hen a child is taken from its country of habitual residence, the left-behind parent may invoke the Convention's return remedy to restore the factual status quo—in ordinary language, to bring an abducted child home." *Id.* at 742. At the time of V's removal, no DNA test been performed, and Petitioner had not been declared a parent. Nor was Petitioner "left behind," as he did not—and still does not—reside in Colombia. The facts of this case simply do not reflect the typical "abduction" seen in Hague Convention cases, particularly when Petitioner had little contact with V, was not her legal parent, and did not live in Colombia at the time of her removal.

19

In sum, Petitioner has not met his burden of proving by a preponderance of the evidence that V's removal was in breach of the "rights of custody attributed to a person, an institution or any other body" under Colombian law. Hague Convention, art. 3. Petitioner presents no Colombian law that establishes a right of custody in the Colombian Family Court while a paternity action is ongoing, or that makes a subsequent paternity order retroactive to the date of the child's removal. Nor does he present sufficient evidence of the orange alert for the Court to conclude that a *ne exeat* order was in place at the time of her departure.

### d. Wrongful Retention

Petitioner's brief focuses exclusively on Respondent's alleged wrongful removal of V from Colombia, yet his reply brief argues in the alternative that Respondent's continued retention of V became wrongful upon entry of the December 16, 2024 Colombian Family Court order. [DE 25 at 282]. While arguments raised for the first time in a reply brief are generally waived, *see Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010), the Court will briefly discuss the merits of this argument.

To establish a wrongful retention beginning on December 16, 2024, Petitioner must first show that the habitual residence of the child immediately before the alleged wrongful retention was in a foreign country. *See Flores-Aldape v. Kamash*, 202 F. Supp. 3d 793, 801 (N.D. Ohio 2016). By that point, V had been living in the United States with Respondent and her husband for more than six months. V has not returned to Colombia, or even left the country, since arriving here. Her permanent resident card indicates that she has been a United States resident since June 6, 2024. [Def.'s Ex. 5]. Respondent testified that, as soon as V arrived in the United States, she

20

began seeing a therapist "because of the events that happened in Columbia (sic) in 2023."[4] [DE 21 at 193]. Thus, it appears that V's habitual residence had changed to the United States at the time of the order.

Petitioner maintains that V's habitual residence could not have shifted because Respondent "never held sole legal custody free of restriction; the Orange Alert prohibited removal, and the Colombian court held institutional custody." [DE 25 at 283]. Thus, "[b]ecause the removal was unlawful, the child's habitual residence never shifted . . . ." [*Id.*]. In other words, Petitioner argues that V's habitual residence did not change when she relocated to the United States because Respondent did not have unilateral authority to determine her place of residence. Yet, the Court has already found that Petitioner failed to prove that V's removal was wrongful, so this argument does not hold weight.

In *Redmond v. Redmond*, the Seventh Circuit considered whether a mother wrongfully retained her child in the United States when she failed to return him to Ireland in violation of the Irish court's custody order. 724 F.3d 729. At the time the mother left Ireland with the child, she had sole custody under Irish law. *Id.* at 732–33. Years later, the Irish court later granted joint custody over the child to the father. *Id.* at 734. The court allowed the mother, who had participated in the proceedings, to return to the United States to wind up her affairs on the condition that she promise under oath to return to Ireland. *Id.* The mother never returned, however. The court found that the mother's retention of the child in the United States after the Irish custody order was not a "wrongful retention" because, at that point, the child's habitual residence was the United States. *Id.* at 732. When the mother first moved with the child, she had sole custody and thus "the

---

[4] The Court understands the "events" Respondent refers to to be Petitioner showing up at V's school in September 2023. Respondent testified that Petitioner "grabbed [V] and she started screaming" during the incident. [DE 21 at 191].

exclusive right to decide where he would live . . . ." *Id.* In other words, the mother's removal of the child without permission from the father did not affect whether the United States was the child's habitual residence because, at the time of removal, the mother was the sole legal custodian and thus "had the "exclusive right to fix the place of [the child's] residence." *Id.* at 747.

While the facts of *Redmond* do not perfectly line up with those here, they illustrate the principle that a removal is not wrongful when it is done by a parent who has sole legal custody as of the date of removal. Here, as the Court discussed above, Respondent's removal of V was not wrongful because she held sole custody at the time of removal. In fact, Petitioner had not even been declared a parent. Accordingly, the United States became V's new habitual residence. By the time the Colombian Family Court ordered that Petitioner was V's legal father, Colombia was no longer V's habitual residence and her retention in the United States was not wrongful.

### 3. Petitioner's Exercise of Custody Rights

The final element that Petitioner must establish is that he was actually exercising or would have been exercising custody rights over V at the time of her wrongful removal or retention. Hague Convention, art. 3. Once it is determined that a party had valid custody rights under the country of origin's laws, the Court should "liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich II*, 78 F.3d at 1065. So long as the Petitioner is found to have custody rights under the laws of the country of habitual residence, "[t]he applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child." *Pliego*, 86 F. Supp. 3d at 697 (quoting *In re Application of Adan*, 437 F.3d 381, 391 (3d Cir. 2006)).

Thus, the question of whether a petitioner was exercising his custody rights is only relevant if the petitioner in fact had custody rights. Because Petitioner has not proven by a preponderance

of the evidence that he had custody rights under Colombian law, the Court will not delve into whether he was exercising those rights.

## C. Exceptions

Though Petitioner's failure to establish a *prima facie* case of wrongful removal ends the inquiry, the Court will also address the defenses to return raised by Respondent. Respondent argues first that Petitioner acquiesced to V's presence in the United States by filing a petition for custody in Hardin County Family Court. [DE 24 at 264]. Second, she argues that this proceeding was commenced more than one year after V's removal from Colombia and she has become well-settled in her new environment. [*Id.* at 271]. Finally, she argues that returning V to Colombia would subject her to a grave risk of harm.

### 1. Acquiescence

Respondent argues that Petitioner's custody action in Hardin County signals his acquiescence to V's removal or retention in the United States. [*Id.* at 264]. Under Article 13 of the Hague Convention, the Court should not order the return of a child if the Petitioner "consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13a. Acquiescence requires either "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich II*, 78 F.3d at 1070. To determine acquiescence, the Court should consider the subjective intent of the parent who is claimed to have acquiesced. *See Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005); *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1288 (S.D. Fla. 1999). Respondent must prove this defense by a preponderance of the evidence. *Friedrich II*, 78 F.3d at 1067.

Respondent maintains that the simple "act of filing a custody petition in a United States court" entails acceptance that "a United States court should determine [V's] custodial situation."

23

[DE 24 at 264–65]. However, in cases where the petitioner continues to seek custody rights after a child's removal or attempts to reach a resolution with the respondent through other means, courts regularly find no acquiescence. *See Friedrich II*, 78 F.3d at 1070 (finding no acquiescence where father "resolutely sought custody" of his son since the removal); *In re A.L.C.*, 16 F. Supp. 3d 1075, 1091 (C.D. Cal. 2014), *vacated in part on other grounds*, 783 F.3d 763 (9th Cir. 2015), *and aff'd in part, vacated in part on other grounds*, 607 F. App'x 658 (9th Cir. 2015) (finding no acquiescence when petitioner attempted to resolve the custody issue with respondent directly, by "trying to negotiate a location that would make both of them happy"); *Guevara v. Soto*, 180 F. Supp. 3d 517, 529 (E.D. Tenn. 2016) (finding no acquiescence when "plaintiff actively sought custody of his child, through local and international channels, from the time the child disappeared through his filing the instant petition"). Petitioner's attempt to seek custody through means other than the Hague Convention petition does not signal his agreement with V's retention in the United States; it simply signals his desire for custody. Accordingly, Respondent has not proven by a preponderance of the evidence that Petitioner acquiesced to V's removal or retention.

### 2. Now Settled Exception

Respondent also argues that Hague Convention proceedings were commenced more than one year after the date of the alleged wrongful removal or retention and V has become settled in the United States. [DE 24 at 271]. Article 12 of the Hague Convention states the general rule that where appropriate proceedings are commenced within one year of a child being wrongfully removed, a court "shall order the return of the child forthwith." Hague Convention, art. 12. Article 12 further provides that even if proceedings are commenced more than one year after the removal, a court shall nevertheless order return "unless it is demonstrated that the child is now settled in its new environment." *Id.* Thus, for this defense to apply, the Respondent must show "by a

24

preponderance of the evidence that the Hague Convention action was not commenced within one year of the abduction and that 'the child is now settled in its new environment.'" *Miller v. Miller*, 240 F.3d 392, 402 n.14 (4th Cir. 2001) (citing Hague Convention, art. 12).

ICARA clarifies that "the term 'commencement of proceedings', as used in article 12 of the Convention, means, with respect to the return of a child located in the United States, the filing of a petition in accordance with subsection (b) of this section." 22 U.S.C. § 9003(f)(3). Subsection (b) then provides:

> Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

*Id.* § 9003(b). Thus, the date of the "commencement of the proceedings" for purposes of this defense is the date of the filing of a judicial petition. *See Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1362 (M.D. Fla. 2002) (citing *Wojcik v. Wojcik*, 959 F. Supp. 413, 418–19 (E.D. Mich. 1997)). Petitioner argues that he commenced proceedings in March 2025 by submitting his "Hague Application through the Central Authority." [DE 25 at 288]. But ICARA makes clear that the relevant date is the date on which Petitioner filed this action—November 21, 2025. [DE 1]. Moreover, the Supreme Court has stated that the one-year period commences on the date the child was wrongfully removed or retained, which, in this case, was May 31, 2024. *See, Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014). Thus, Petitioner commenced the proceedings more than one year after the alleged wrongful removal of V.

Respondent next has to show that V is now settled in the United States. In considering whether a child is "now settled" in the United States, the Court may consider post-petition evidence that the child is settled in her new environment. *Costa v. de Lima*, 94 F.4th 174, 182 (1st Cir.

25

2024). As the First Circuit stated in *Costa v. de Lima*, the Hague Convention's text suggests that the drafters intended for the use of such evidence:

> Refined to bare essence, the text of the Convention explicitly contemplates a court considering the child's circumstances after the petition has been filed without reference to his prior situation. The phrase "now settled" — the wording of which itself suggests an emphasis on the present — is introduced in the context of post-petition circumstances without reference to pre-petition circumstances. If the drafters of the Convention had intended to require that the removing parent include pre-petition evidence, one would expect them to \*183 have expressed that intent more explicitly in the text.

94 F.4th at 182–83. Accordingly, the Court may consider any evidence presented by Respondent of V's settlement in the United States—even if it post-dates the November 2025 petition. In determining whether the child is now settled, courts consider factors such as "the age of the child, the stability of the child's residence in the new environment, whether the child attends school or day care consistently, whether the child attends church regularly, the stability of the . . . [respondent's] . . . employment, and whether the child has friends and relatives in the new area. *Blanc v. Morgan*, 721 F. Supp. 2d 749, 763 (W.D. Tenn. 2010); *see also Aranda v. Serna*, 911 F. Supp. 2d 601, 614 (M.D. Tenn. 2013); *In re Koc*, 181 F. Supp. 2d 136, 152 (E.D.N.Y. 2001); *Wojcik*, 959 F. Supp. 413 at 421.

Here, V is now seven and a half years old and has been residing in the United States for more than two years as a permanent resident. She attends elementary school in Elizabethtown, Kentucky and participates in extracurriculars, including gymnastics and karate. She sees various doctors and a mental health therapist in the area. She lives with her mother and stepfather, who are married and provide a stable life for V in Kentucky. Through this evidence, Respondent has demonstrated that V is now settled in her new environment. Thus, the Court will also deny the petition on grounds that the "now settled" exception applies.

### 3. Grave Risk Exception

Finally, Respondent argues that the "grave risk" exception applies. [DE 24 at 268–69]. Article 13b of the Hague Convention provides that the Court is not bound to order the return of a child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13b. To establish the applicability of this defense, the Respondent must show that "the risk to the child is grave, not merely serious." *Simcox*, 511 F.3d at 605 (quoting *Friedrich II*, 78 F.3d at 1068; *see also Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000) ("[T]he harm must be a great deal more than minimal."). The exception "is to be interpreted narrowly, lest it swallow the rule." *Simcox*, 511 F.3d at 604 (citing *Friedrich II*, 78 F.3d at 1067). The respondent must establish the grave risk exception by clear and convincing evidence. *Id.*

Respondent argues that this exception applies because neither Petitioner nor Respondent reside in Colombia, so there would be no household to receive V should she be returned. [DE 24 at 270]. Petitioner maintains that this does not fall into the two categories of "grave risk" delineated by the Sixth Circuit [DE 23 at 248]: (1) when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—*e.g.*, returning the child to a zone of war, famine, or disease"; and (2) "in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Friedrich II*, 78 F.3d at 1069.

The Court need not reach this exception, given that it denies the Petition on grounds that Petitioner failed to meet his burden and the now-settled exception applies. Even so, the Court notes that it has concerns about sending a child to a country where neither of her parents resides. While Petitioner may be correct that the risk V would be subjected to in returning to Colombia does not

27

resemble other cases where the court found "grave risk," this is likely due to the unusual nature of this case. The Court is aware of no other Hague Convention case in which *both* parents reside in the United States, yet one parent seeks return of the child to a foreign country. The Court certainly believes it would constitute an "intolerable situation" to send a young child to a country where she has no parent to receive her. Once more, it is unsurprising that there are no cases directly on point considering perplexing nature of Petitioner's request—to send his purported child to a country where neither parent lives. While "grave risk" does not exist when repatriation might cause "inconvenience or hardship" or "adjustment problems," *see Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001), *overruled in part by Golan v. Saada*, 596 U.S. 666 (2022), the return of V to a country where she has no established household to receive her would likely result in more severe consequences.

## IV.    CONCLUSION

For the reasons stated above, Petitioner Jhonnatan Henao Tamayo's Petition for the return of minor child, "V," to Colombia under the Hague Convention on the Civil Aspects of International Child Abduction [DE 1] is **DENIED** and this matter is **DISMISSED**. The Court will enter a separate judgment.

Rebecca Grady Jennings, District Judge
United States District Court

July 20, 2026

28